# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | | |
|---|---|---|
| **THOMAS BOYD BIHM** | * | **CIVIL ACTION NO. 13-0249** |
| **VERSUS** | * | **JUDGE HAIK** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Thomas Boyd Bihm, born November 2, 1968, filed an application for a period of disability and disability insurance benefits on September 28, 2010, alleging disability as of April 12, 2002, due to left knee problems, obesity, high blood pressure and a learning disability.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the

Commissioner's decision comports with all relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:[1]

**(1) Records from Doctor's Hospital dated April 15, 2002 to July 15, 2003**.  On April 15, 2002, claimant complained of slipping and twisting his left knee while working on November 8, 2000.  (Tr. 213).  He previously had an arthroscopic exam on this knee and did okay until this occurrence.  An MRI of the left knee revealed evidence of an anterior cruciate ligament tear, ill-defined edema and peripheral tear in the posterior horn of the medial meniscus.  (Tr. 213).

On examination of the left knee, claimant had tenderness to palpation medially and 1-2+ joint effusion.  He had no gross instability of the knee or increased heat, inflammation, or induration.  CMS was intact.

X-rays revealed some diminished patellar joint space.  (Tr. 214).

Dr. Butand's impression was torn ACL of the left knee, possibly of medial meniscus pathology.  He recommended an arthroscopic exam.

---

[1]Although only the medical reports relating to the arguments have been summarized herein, the undersigned has reviewed all of the evidence contained in the record.

On April 16, 2002, Dr. Butaud performed an arthroscopic exam with resection of the anterior and posterior horn, lateral meniscus with ACL reconstruction using patellar tendon graft.  (Tr. 218).

On March 10, 2003, claimant continued to have problems with his knee and had developed some effusion.  (Tr. 258).  On examination, claimant had some chondromalacia present.  (Tr. 259).

Dr. Butand's impression was probable meniscal pathology of the left knee. He recommended an arthroscopic exam of the left knee with resection of chondromalacia, patellofemoral joint, medial femoral condyle, and resection of the posterior horn of the medial meniscus.

On March 10, 2003, Dr. Butaud performed a resection of the medial meniscus, chondromalacia, medial femoral condyle and patellofemoral joint.  (Tr. 238-39).

**(2) Functional Capacity Evaluation dated October 26, 2009**.  Anthony J. Quinn, P.T., opined that claimant demonstrated the ability to perform at the heavy physical demand level.  (Tr. 270).  Mr. Quinn recommended that he avoid activities which required him to squat or stand in place for greater than 30 minutes at a time.  He further recommended that claimant enroll in a wellness program in order to improve his cardiovascular conditioning and endurance.

**(3) Report from Lyle L. LeCorgne, Ph.D., dated April 23, 28, 2008**.

Claimant reported that he had a ninth-grade education, had been retained in the

second grade, and eventually resigned from school because he "wasn't cutting it."

(Tr. 316).  He stated that "[r]eading was a problem."   Dr. LeCorgne evaluated him

to identify any learning disability and appropriate strategies to provide vocational

rehabilitation services and/or training options.

On examination, claimant was mildly depressed, and his affective

expression was appropriate to conversation topics.  Memory functioning was

grossly intact.  Insight and judgment were good.

Administration of the WAIS-III revealed a full-scale IQ of 84, verbal IQ of

83 and performance IQ of 86.  (Tr. 317).

Dr. LeCorgne concluded that claimant had a significant reading disability

that would limit the range and nature of vocational options that might otherwise be

available to him.  (Tr. 321).  His diagnostic impression was reading disorder, pain

disorder associated with a general medical condition, psychosocial stressors,

functional illiteracy, and work disability.  Claimant's Global Assessement of

Functioning score was 60, moderate symptoms currently and for the previous year.

**(4) Functional Capacity Evaluation by Jerry LeLeux, P.T., dated**

**December 2 and 3, 2003**.  Claimant's functional level was rated as medium.  (Tr.

4

322).  He was able to handle weights up to 25 pounds frequently and 50 pounds

occasionally.  However, the examiner determined that allowing claimant to

perform at this level would be detrimental to his left knee, which exhibited

symptoms consistent with degeneration, such as crepitus, "popping" with motion,

pain with kneeling and pain during squatting and descending stairs.

**(5) Records from Dr. Butand dated March 8, 2003 to April 29, 2010**.  On

March 26, 2003, claimant had knee swelling.  (Tr. 603).  Dr. Butand administered

Synvisc injections.  Claimant stated that Synvisc and Celebrex gave him a little

pain relief.  (Tr. 604).

On January 21, 2004, claimant was doing fairly well.  (Tr. 606).  Dr. Butaud

had reviewed the Functional Capacity Evaluation, and concurred with the

functional level rating of medium.

Dr. Butaud stated that claimant's knee was basically unchanged at that

point.  He noted that claimant was still having some discomfort, and Bextra

seemed to help.  He opined that claimant had reached Maximum Medical

Improvement.  He concluded that once a job description could be obtained that

would meet the FCE, they could proceed with allowing claimant to return to work.

On July 21, 2004, claimant seemed to be doing fairly well.  He had not had

any more giving out.  (Tr. 607).  The knee was doing well, and Bextra seemed to

5

help.  He did have some arthritic problems, and that seemed to help a lot.

On February 1, 2006, Dr. Butaud noted that claimant had marked degeneration of the joint.  (Tr. 608).  He did not feel that claimant was disabled.

On February 3, 2006, claimant continued to have discomfort in the knee and really had trouble staying up on his feet for any prolonged period of time.  (Tr. 609).  He had gained a significant amount of weight.

On examination, claimant had a mild effusion.  He had no increased heat, inflammation or induration.  He had no evidence of instability.  He had a slight amount of crepitation medially.  He had a 10 degree varus deformity.

X-rays revealed complete medial joint space collapse on the right with flexion weight bearing as well as straight weight bearing.  (Tr. 610).  He was starting to get some varus thrust.

Dr. Butaud's impression was degenerative arthritis of the left knee post-ACL reconstruction and arthroscopy.  He opined that claimant would eventually require a knee replacement or maintain a sedentary lifestyle.  He did not believe that claimant could return back to his former type of employment or even perform medium duty work.

At that point, Dr. Butaud thought that the less standing and walking claimant did, the better off he was.  He recommended a job where claimant was

sitting and sedentary in nature.  He stated that he would see claimant back on a yearly basis.

On February 7, 2007, claimant still had marked degeneration in his knee. (Tr. 611).  His right knee was starting to give him a little trouble.  The left knee showed complete medial joint space collapse with significant patellofemoral joint disease and some early lateral joint disease development.  Dr. Butaud thought that claimant was basically deteriorating slowly and would eventually require a knee replacement.

Dr. Butaud opined that claimant was still at a sedentary type level at that point.  He thought that his disability was increasing slowly secondary to degeneration of the joints.

On April 15, 2008, claimant was still having discomfort in his knee.  (Tr. 612).  Dr. Butaud noted that claimant would eventually require knee replacement. He recommended "continued disability benefits."[2]

X-rays showed more degenerative changes of the left knee, but claimant was still able to get around.  Dr. Butaud stated that he would see claimant back in one

_____

[2]Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work."  *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (*citing* 20 C.F.R. § 1527(e)(1)).  These determinations are legal conclusions that the regulation describes as "reserved to the Commissioner."  *Id*.

year for follow-up.

On April 16, 2008, Dr. Butand had a rehabilitation conference.  (Tr. 613).
He recommended a weight reduction program, and that claimant lose at least 150
pounds.

On April 15, 2009, claimant was doing fairly well, and having fairly good
results with his knees.  (Tr. 614).  He had lost approximately 60 to 80 pounds.

Dr. Butand explained that consideration of a partial knee replacement could
be entertained if the lateral joint was okay.  He stated that since claimant was
doing well, they would leave things as is.  He recommended continued disability
benefits.

On January 13, 2010, Dr. Butaud had a rehabilitation conference with
claimant.  (Tr. 616).  He concurred that claimant needed to have bariatric surgery
because of his large size before trying knee replacement.  He did not feel that
claimant could do any kind of work with the way his knee was at that point.

On March 29, 2010, claimant was at 395 pounds.  (Tr. 617).  Dr. Butaud felt
that claimant should be in the 250 pound range before consideration of a total knee
replacement.  He thought that the process would take one and a half to two years
prior to proceeding with total knee with the weight reduction program.  He opined
that the types of jobs claimant could do after total knee replacement would be light

duty, and that he definitely could be a driver.  He did not feel that prolonged standing was a good idea.

On April 26, 2010, claimant's weight was up to about 420 pounds.  (Tr. 618).  Dr. Butaud had recommended that he get his weight down.  He had suggested the possibility of bariatric surgery.

On examination, claimant had no swelling, increased heat, or inflammation of the knee.  He had some crepitation with flexion and extension medially.  He had no specific instability, effusion, increased heat, or inflammation of the knee.  His CMS was intact.

Dr. Butaud recommended a significant weight reduction before considering joint replacement.

**(6) Claimant's Administrative Hearing Testimony**.  At the hearing on October 21, 2011, claimant was 42 years old.  (Tr. 29).  He was 6 feet 2 inches tall and weighed over 400 pounds.  He had a driver's licence.

Claimant testified that he had completed the ninth grade.  (Tr. 32).  He had been told that he had a learning disability.  (Tr. 35).  He stated that he attended an hour resource class every day.

Claimant said that he could read and write "very little."  (Tr. 33).  He reported that he could write his name and a short note if he had to.  He stated that

he could not read a newspaper but could read most of a menu.  He could do basic math such as adding and subtracting.

As to employment, claimant testified that he had last worked in April of 2002.  (Tr. 33-34).  He stated that he had worked as a driller on an oil rig.  (Tr. 34).

Claimant stated that he was still being treated for his knee condition by Dr. Butand.  (Tr. 29).  He reported that he had high blood pressure for which he was taking medication, which did not cause any side effects.  (Tr. 30, 32).

Claimant testified that a total knee replacement had been recommended after gastric bypass surgery.  (Tr. 30-31).  He complained that he still had knee pain and swelling.  (Tr. 31-32).  He stated that he did not wear his knee brace because it was uncomfortable.  (Tr. 32).

Regarding activities, claimant reported that he was able to dress and bathe himself without assistance, perform housework like doing dishes and laundry, and take care of his yard.  He said that he did not know how far he could walk before having to take a break.  (Tr. 34).

**(7) Administrative Hearing Testimony of Thomas G. Mungall, III, Vocational Expert ("VE")**.  Mr. Mungall described claimant's past work as a driller as medium with a Specific Vocational Preparation of 6.  (Tr. 36).  The ALJ

posed a hypothetical in which he asked the VE to assume a claimant of the same

age and educational level who was limited to sedentary work; pushing/pulling

only 10 pounds occasionally; standing and walking for two hours out of eight, and

sitting for six hours out of eight with normal breaks.  In response, Mr. Mungall

testified that such claimant could not do his past work, but could work as an

information clerk, of which there were 1,100,790 nationally and 16,630 statewide,

and department store greeters, of which there were 42,020 nationally and 1,500

statewide.  (Tr. 36-37).

The ALJ changed the hypothetical to assume a claimant of the same age,

education, and work experience, but due to a combination of impairments, was

unable to engage in sustained work activity for a full eight-hour workday on a

regular and consistent basis.  (Tr. 37).  In response, the VE testified that no jobs

were available.

**(8) The ALJ's Findings**.  Claimant argues that the Commissioner erred: (1)

in failing to consider all relevant evidence concerning his learning disability and

knee pain; (2) in failing to consider and discuss all relevant evidence concerning

his obesity; (3) in failing to consider and discuss relevant evidence to determine

the combined effect of his learning disability, severe exertional impairments and

non-exertional functional impairments, and (4) in failing to consider and discuss

all relevant evidence to determine his residual functional capacity.

Claimant's disability insured status expired on March 31, 2008.  (Tr.  10).

The Social Security regulations provide as follows:

> An individual is entitled to the establishment of a period of disability
> and to disability insurance benefits in any month only if he or she
> enjoys fully insured status as defined in Section 216(i)(3) and Section
> 223(c), and has had not less than 20 quarters of coverage during the
> 40-quarter period ending with the quarter in which disability occurs.

*Oldham v. Schweiker*, 660 F.2d 1078, 1080, n. 1 (5th Cir. 1981) (*citing* 42 U.S.C.

§§ 416(i)(3), 423(c)).

Thus, a claimant is eligible for benefits only if the onset of the qualifying

medical impairment began on or before the date the claimant was last insured.  *Ivy*

*v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).  Claimants bear the burden of

establishing a disabling condition before the expiration of their insured status.  *Id*.

(*citing Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir.1986)).  Factors relevant to

the determination of the date of disability include the individual's declaration of

when his disability began, his work history, and available medical history.  *Id*.

(*citing* SSR 83–20).  Evidence showing the degeneration of claimant's condition

after his insured status expired is not relevant to the Commissioner's disability

analysis.  *Torres v. Shalala*, 48 F.3d 887, 894, n. 12 (5th Cir. 1995); *Dominguez v.*

*Astrue*, 286 Fed.Appx. 182, 185 (5th Cir. 2008); *Leval v. Comm'r of Soc. Sec.*, 2012 WL 1123839 (W.D. La. Mar. 13, 2012), *report and recommendation adopted*, 2012 WL 1123835 (W.D. La. Apr. 3, 2012).

First, claimant asserts that the ALJ failed to consider all relevant evidence concerning his learning disability.

The ALJ determined that claimant had a limited education and was able to communicate in English.  (Tr. 20).  Under the Social Security regulations, limited education is defined as follows:

> *Limited education*. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a *7th grade through the 11th grade level of formal education* is a limited education.

(emphasis added).  20 C.F.R. § 404.1564.

Claimant argues that according to Dr. LeCorgne's report, he is a functional illiterate.  (Tr. 321).  At the hearing, claimant testified that he could read and write "very little."  (Tr. 33).  He reported that he could write his name and a short note if he had to.  He stated that he could not read a newspaper, but could read most of a menu.  He said that he could do basic math such as adding and subtracting.

In his Disability Report, claimant indicated that he could speak and understand English.  (Tr. 125).  Additionally, he stated that he could read and understand English.  He further wrote that he could write more than his name in English.  Moreover, he wrote in his Function Report that he helped his children with homework.  (Tr. 170).

Here, the claimant's own report contradicts his allegation of illiteracy. Accordingly, the ALJ's assessment as to credibility is entitled to great deference. *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).

In any event, claimant has failed to show that he was prejudiced by the ALJ's  decision.  Procedural perfection in administrative proceedings is not required.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012).  This court will not vacate a judgment unless the substantial rights of a party have been affected.  *Mays*, 837 F.2d at 1364.

Here, claimant has not shown that his substantial rights were affected.  The Medical-Vocational Guidelines direct a finding of not disabled for a claimant who is a younger individual age 18-44 who is limited to sedentary work and has a limited or less education *or* is illiterate.  (emphasis added).  20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, Rules 201.25, 210.23.  Thus, whether claimant had a limited education or was illiterate does not change the result that claimant was not

disabled.  *See Brock v. Chater*, 84 F.3d 726, 728-29 (5th Cir. 1996) ("[t]o establish prejudice, a claimant must show that he 'could and would have adduced evidence that might have altered the result.' [citation omitted]  . . . .  We will not reverse the decision of an ALJ for lack of substantial evidence where the claimant makes no showing that he was prejudiced in any way by the deficiencies he alleges."). Accordingly, I found that this error was harmless.

Next, claimant asserts that the ALJ failed to consider all of the relevant evidence concerning claimant's disabling pain.  [rec. doc. 8, p. 14].

To prove disability resulting from pain, an individual must establish a medically determinable impairment that is capable of producing pain.  *Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *Id*.  Disabling pain must be constant, unremitting, wholly unresponsive to therapeutic treatment, and corroborated in part by *objective* medical testimony.  (emphasis added). *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

In support of claimant's argument, he cites Dr. LeCorgne's finding that his presentation and response to the Pain Patient Profile Standardized Test ("P-3")

was valid.  (Tr. 320).  However, Dr. LeCorgne noted that the P-3 was designed to identify pain patients who are experiencing emotional distress which might affect their symptoms and response to treatment, as well as to offer recommendations regarding the need for mental health treatment.  He expressly deferred to claimant's medical providers regarding their opinions and recommendations regarding his physical capabilities associated with his knee injury.  (Tr. 321).  *See Newton*, 209 F.3d at 455 (a specialist's opinion generally is accorded greater weight than that of a non-specialist).

In finding that claimant's pain was not disabling, the ALJ relied on the reports from claimant's treating physician, Dr. Butaud.  (Tr. 18-19).  On February 1, 2006, Dr. Butaud did not feel that claimant was disabled.  (Tr. 608).  At claimant's exam on February 3, 2006, Dr. Butaud opined that claimant could be at a job where he was sitting and sedentary in nature.  (Tr. 610).  A year later on February 7, 2007, he believed that claimant was at a sedentary-type level.  (Tr. 611).

On January 13, 2010, Dr. Butaud opined that claimant needed to have bariatric surgery because of his weight before trying knee replacement.  (Tr. 616).  On March 29, 2010, Dr. Butaud noted that claimant was at 395 pounds and should be in the 250 pound range before consideration of a total knee replacement.  (Tr.

16

617).  He opined that the types of jobs claimant could do after total knee replacement would be light duty.

Here, the medical records do not support claimant's argument that his pain was disabling.  His subjective symptomatology has been found incredible.  (Tr. 18); *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir.1989).

Further, claimant testified that he had a knee brace, but did not wear it because it was uncomfortable.  (Tr. 32).  It is well established that failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 404.1530(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990). Accordingly, the ALJ's finding regarding claimant's pain is entitled to deference. *Newton*, 209 F.3d at 459.

Next, claimant argues that the Commissioner failed to consider and discuss relevant evidence to determine the combined effect of his impairments.  [rec. 8, p. 20].

The ALJ noted that claimant had alleged disability due to left knee problems, obesity, and hypertension, reporting that he was unable to squat, climb ladders or stairs, and walk long distances.  (Tr. 18).  He also reported that because of severe pain, he had sleep disturbance because he could only lie in certain positions.

However, the ALJ discredited these allegations on the basis that claimant was able to take care of his personal needs, prepare meals, perform household chores, drive, shop at least twice a week for approximately 15 minutes at a time, attend church twice a week for at least one and one-half hours, and lift at least 50 pounds.  (Tr. 18; 170-73, Function Report).  Additionally, his Function Report indicated that he picked up his kids from school, helped with homework, fed his dog, and did light house cleaning and yard work.  (Tr. 170-71).  It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status.  *Leggett v. Chater*, 67 F.3d 558, 565, n. 12 (5th Cir. 1995).

Next, claimant argues that the ALJ erred in failing to consider the functional limitations resulting from his obesity in accordance with SSR 02-1p.

The prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems.  SSR 02-1p.  Section 1.00Q, which was added to the musculoskeletal listing, states that obesity is considered to be a medically determinable impairment, and reminds adjudicators to consider its effects when evaluating disability.  *Id*.; 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 1.00Q.  This provision also reminds adjudicators that the combined effects of obesity with musculoskeletal impairments can be greater than the effects

18

of each of the impairments considered separately.  *Id*.  Therefore, "when

determining whether an individual with obesity has a listing-level impairment or

combination of impairments, and when assessing a claim at other steps of the

sequential evaluation process, including when assessing an individual's residual

functional capacity, adjudicators *must* consider any additional and cumulative

effects of obesity."  (emphasis added).  *Id*.

Here, the record reflects that the ALJ considered the effects of claimant's

obesity on his RFC, as he specifically found his obesity to be a severe impairment.

(Tr. 16).  Additionally, he noted that claimant, at 6 feet 2 inches tall and 400

pounds, had a BMI of 51.4.  Further, he specifically mentioned SSR 02-1p in his

decision.  (Tr. 17).

Moreover, the ALJ noted that Dr. Butand had opined on January 13, 2010,

that claimant needed bariatric surgery before a knee replacement.  (Tr. 19).  Dr.

Butand reiterated on March 29, 2010, that claimant should do weight reduction,

since he was 6 feet 1 inch tall and weighed 395 pounds, before consideration of a

total knee replacement, and that he should be in the 250-pound range.  On April

26, 2010, claimant's weight was up to 420.

Claimant argues that the ALJ failed to "consider and engage in a meaningful

discussion about [claimant's ] obesity 'at each step of the sequential analysis after

19

the first step'." [rec. doc. 8, p. 19].  However, the ALJ specifically stated that

"claimant's weight combined with his other impairments cause his other

impairments to intensify" at step 2.  (Tr. 17).  Additionally, the ALJ mentioned

claimant's obesity when analyzing his alleged knee complaints and hypertension

at step 4.  (Tr. 18).  *Cf. Hobbs v. Astrue*, 627 F.Supp.2d 719, 727 (W.D. La. 2009)

(Drell, J.) (although ALJ did not mention claimant's obesity or discuss the impact

of her obesity on her ability to work, he did, in effect, consider the impact of

claimant's obesity on her ability to work when he considered the impact of the

physical symptoms caused or aggravated by her obesity); *see also Chapa v.*

*Astrue*, 2012 WL 4797117, *15 (S.D. Tex. 2012) ("[b]ecause the ALJ's RFC

assessment contemplated all the evidence regarding plaintiff's health, and that

evidence necessarily reflected the impact of his weight, the decision was supported

by substantial evidence notwithstanding his failure to explicitly discuss plaintiff's

obesity.").

  Unlike *Hobbs*, where the ALJ failed to mention claimant's obesity at all, the

ALJ in this case specifically found claimant's obesity to be a severe impairment,

and  discussed the impact of his impairments of left knee problems, obesity, and

hypertension on his residual functional capacity.  (Tr. 16-18).  Therefore, although

the ALJ failed to specifically discuss SSR 02-1p when making the residual

20

functional capacity determination, claimant has not shown how he was prejudiced by this failure since the effects of his obesity were considered.  *Hobbs*, 627 F.Supp.2d at 727.

Claimant fourth argument is that the ALJ erred in assessing his residual functional capacity.

Claimant asserts that in making an RFC determination, the ALJ must consider all relevant evidence in the record, including the opinions and statements by all medical sources, and apply the factors provided in 20 C.F.R. § 404.1527(d).[3] [rec. doc. 8, p. 23].  The record reflects that the ALJ considered the medical evidence, particularly the reports of claimant's treating physician, Dr. Butaud, which he gave great weight.  (Tr. 18-19).  Claimant has cited no evidence to the contrary.

Finally, claimant argues that because the ALJ's RFC finding was not properly supported, he could not use that RFC to determine a Medical-Vocational Guideline category. [rec. doc. 8, p. 24].  However, as set forth above, the ALJ properly determined the claimant's RFC.

Claimant also argues that the hypothetical presented to the vocational expert did not accurately reflect all relevant testimony and evidence.  [rec. doc. 8, p. 24].

---

[3]The factors for weighing medical opinions are now found in § 404.1527(c).

However, the ALJ is not bound by VE testimony which is based on evidentiary assumptions ultimately rejected by the ALJ. *See Owens v. Heckler,* 770 F.2d 1276, 1282 (5th Cir.1985); *Shumock v. Astrue,* 2013 WL 1289160, *11 (W.D. La. March 1, 2013).

Regardless, the ALJ relied on the Grids, not vocational expert testimony, at the fifth step.  It is well established that if impairments are solely exertional or the nonexertional impairments do not sufficiently affect the claimant's residual functional capacity, then the Commissioner may rely exclusively on the Grids to determine whether there is other work in the economy that the claimant can perform. *Newton,* 209 F.3d at 458 (*citing Fraga v. Bowen,* 810 F.2d 1296, 1304 (5th Cir. 1987)).  As the medical evidence supports the finding that claimant's impairments do not significantly affect his RFC, the ALJ's reliance on the Grids to find that he was not disabled is entitled to deference.  Accordingly, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections

with the Clerk of Court.  A party may respond to another party's objections within

fourteen (14) days after being served with a copy thereof.  Counsel are directed to

furnish a courtesy copy of any objections or responses to the District Judge at the

time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

**FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL**

**CONCLUSIONS REFLECTED IN THIS REPORT AND**

**RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING**

**THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME**

**AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED**

**PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE**

**LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT,**

**EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED***

***SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed May 27, 2014, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

```
Copy sent:  RTH
On:  5/27/2014
By:  MBD
```

23